**B. SANFIELD, INC.,**
**Plaintiff/Counterdefendant,**

v.

**FINLAY FINE JEWELRY CORPORATION, Defendant/Counter-plaintiff.**

No. 93 C 20149.

United States District Court,
N.D. Illinois,
Western Division.

March 5, 1998.

---

Brian D. Shore, Guyer & Enichen, Erik K. Jacobs, Kostantacos, Traum, Reuterfors & McWilliams, P.C., Rockford, IL, for Plaintiff.

Tyrone C. Fahner, Mayer, Brown & Platt, Chicago, IL, for Defendant.

**1.** Defendant filed a counterclaim against plaintiff which was settled during trial.

**2.** The court compliments the attorneys on both sides for an organized presentation of evidence

## MEMORANDUM OPINION AND ORDER

REINHARD, District Judge.

Plaintiff, B. Sanfield, Inc., filed a three-count, second amended complaint alleging a false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a), a false advertising claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) 815 ILCS § 505/2, and a claim for punitive damages under the Consumer Fraud Act against defendant, Finlay Fine Jewelry Corp. based on certain advertisements by defendant of fine jewelry at 50% off the regular price.[1] The court conducted a bench trial pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and, based upon the following findings of fact and conclusions of law[2], enters judgment in favor of defendant and against plaintiff on all three counts of the second amended complaint.

Plaintiff is a locally-owned retailer located in Rockford, Illinois, that sells, among other things, jewelry, including the types at issue in this case. Defendant also sells jewelry at retail. It does so by leasing space in host department stores. Defendant leases in host department stores to benefit from the host's established customer base, its general customer traffic, and its policies, such as liberal returns and interest free credit. In this case, plaintiff's claims are based on the advertised sales of jewelry by defendant at two Bergner's department store locations in Rockford, Illinois.

Defendant advertises its jewelry consistent with the department store industry. In that regard, it markets jewelry by periodically offering it at discounted prices. While the discounts for the four categories of jewelry at issue here vary, they typically range from 40–60% off the regular, ticketed price. These items are originally priced at about 5.5 times the cost. Defendant offers its jewelry at the regular price for about one third of the fiscal year. This is done via a jewelry sale rotation schedule. Defendant does not, however, strictly adhere to the rotation schedule.

during the trial and thorough post-trial briefs, both of which assisted the court in reaching its conclusion and preparing this order. .

Defendant advertises its discount prices in several ways. Many of its sales are advertised in-store only, through the use of counter signs located on its jewelry counters. Defendant also advertises outside its host stores by using newspaper advertisements, direct mail flyers and catalog inserts.

Defendant and plaintiff differ in their methods of purchasing these types of gold jewelry. Defendant purchases inventory for more than 827 stores from one location and does so by the price from hundreds of vendors. On the other hand, plaintiff purchases for only one location and does so primarily by weight rather than price. In addition to purchasing gold jewelry outright for resale, defendant also sells jewelry on consignment and under gold leasing. Pursuant to this latter method, defendant pays the vendor for the gold value up-front and pays for the value of the other costs after the jewelry is sold at retail.

Defendant and plaintiff also price their jewelry differently. For example, plaintiff ordinarily prices gold chains by weight, whereas defendant sets prices based on its costs and a profit margin. Additionally, plaintiff sells custom jewelry whereas defendant does not.

The court points out these differences in the way plaintiff as a local, single-store retailer prices and advertises jewelry versus that of large, multi-store retailers, such as defendant, only to give context to plaintiff's claims of deception. Other relevant facts will be set forth in discussing the dispositive issues presented at trial.

### I. *Consumer Fraud Act* [3]

■ To establish a claim under the Consumer Fraud Act, plaintiff must prove: (1) defendant engaged in a deceptive act or practice; (2) intended that a party rely on the deception; and (3) the deception occurred in a course of conduct involving trade or commerce.[4] *See Garcia v. Overland Bond & Inv. Co.*, 282 Ill.App.3d 486, 491, 218 Ill.Dec.

36, 668 N.E.2d 199 (1st Dist.1996) (citing *Siegel v. Levy Org. Dev. Co.*, 153 Ill.2d 534, 542, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992)). The Consumer Fraud Act does not require, however, that a party have relied on the deception. *Id.* Nor does it require that anyone actually be misled, deceived or damaged, 815 ILCS 505, or that the defendant acted in bad faith, *Washington Courte Condo. Association–Four v. Washington–Golf Corp.*, 267 Ill.App.3d 790, 837, 205 Ill.Dec. 248, 643 N.E.2d 199 (1st Dist.1994). A plaintiff need only prove an innocent misrepresentation. *Washington–Courte*, 267 Ill.App.3d at 837, 205 Ill.Dec. 248, 643 N.E.2d 199. Furthermore, an advertisement is deceptive if it creates the likelihood of deception or has the capacity to deceive. *Id.* In interpreting advertising in this context, the focus is on the net impression it is likely to make on the general population. *Id.* It is immaterial that a given phrase may be technically construed as not constituting a misrepresentation or that a deception is accomplished by innuendo rather than an affirmative misstatement. *Id.*

■ While defendant claims it is entitled to judgment under the Consumer Fraud Act on several bases, the court finds plaintiff has failed to carry its burden on the issue of whether the accused advertising constituted a deceptive act or practice. As to this first issue, plaintiff claims that defendant's advertisements, which offer certain types of fine jewelry [5] at 50% off the regular price, is deceptive for the following reasons: (1) defendant does not intend to sell any of the jewelry items at regular price; (2) defendant fails to sell a substantial number of jewelry items at the regular price; (3) defendant does not offer the jewelry items for sale at the regular price for a substantial period of time; (4) defendant does not offer the jewelry items for sale with the good-faith intention to sell them at regular price; and (5) a public opinion poll conducted by plaintiff's expert demonstrates that consumers are misled or

---

**3.** As the parties have chosen to address this claim first in their post-trial briefs, the court will also address this claim first.

**4.** The parties have stipulated that element three has been met in that the advertising at issue here concerned trade or commerce.

**5.** The jewelry items at issue here are gold chains, earrings, bangles and charms. When the court uses the term jewelry in reference to defendant's advertisements, it means these four categories of jewelry.

deceived by defendant's advertisements. Put another way, plaintiff claims that defendant's advertisements constitute a deceptive act or practice because it uses the term "regular price" merely as a basis for its discounted price with no intention of ever selling any of the items at the regular price. The evidence, however, fails to support plaintiff's claim.

The evidence demonstrates that defendant prices its jewelry to meet certain gross margin goals. In doing so, it establishes both a regular price and a discount price simultaneously. In pricing its jewelry in this fashion, defendant uses certain mark-ups that, when discounted 50%, will yield the desired gross margins. It does not keep records of the amount of sales at discount or regular prices, only whether a store is meeting its gross margin goals. The court finds nothing actionable about defendant's pricing scheme under the Consumer Fraud Act. Indeed, plaintiff apparently does not suggest otherwise. Rather, plaintiff's focus is on the fact that the formulated regular price, which is subsequently used to advertise the discount price, is a sham which deceives the public.

It is undeniable that the term "regular price" is material to defendant's pricing and advertising scheme. There is nothing inherent in the term "regular price," however, that suggests that defendant either sells those jewelry items at that price or that it offers them at that price for any particular period of time. Regular price, in this context, merely implies the non-discounted price. On their face, the advertisements are not deceptive.

Plaintiff's contend, however, that the advertisements are deceptive because defendant actually sells very few, if any, of the items at the stated regular price or that they even attempt to do so for a reasonably substantial period of time. Deception, like beauty, is in the eye of the beholder. If consumers generally understand that a retailer makes little or no concerted effort to sell at a stated regular price, then stating the price as regular would be neither deceptive nor misleading. It might impact the efficacy of the promoted sale, but it would not deceive. If the consuming public held the opposite belief, that is, that regular price is the price that defendant's regularly and genuinely offer the advertised items for sale at, then that would evidence deception. Absent consumer per-ceptions, however, whether defendant actually offers or sells the items at regular price proves little, if anything, in this context.

Recognizing this point, plaintiff has offered survey evidence of consumers' attitudes toward the term regular price in discount advertising. To that end, plaintiff engaged the services of Dr. Janet McConeghy, associate director of the Northern Illinois Public Opinion Laboratory, to conduct a telephone survey in the Rockford area to assess the attitudes of consumers concerning jewelry discount advertising. In that regard, plaintiff points to the survey results which show that: (1) 95.1% of consumers believe that at least some jewelry products sell at the regular price; (2) 94% of consumers are under the impression that more jewelry is sold at regular price than the actual highest percentage sold at regular price in this case; (3) only 0.8% of consumers were under the impression that the mark-up used to establish the regular price exceeded five times the cost; (4) consumers believe that, on average, an item costing $100.00 is given a regular price of $228.56; (5) 21% of consumers had bought an item of jewelry at 50% off its regular price at one store and later found the same or similar item at another store with a regular price lower than the discount price they had previously paid; and (6) 8.3% of the 21% felt they had been deceived. The court finds this evidence to be of little value in proving that the use of the term regular price in defendant's advertisements rendered the advertisement a deceptive act or practice.

The fact that over 95% of the consumers surveyed believe at least *some* jewelry products sell at the regular price merely reflects the reality of defendant's pricing scheme. In fact, according to the statistics provided by defendant for its two Rockford stores, some of the items did sell at regular price, albeit a small percentage. Additionally, according to defendant's witnesses, some of the contested jewelry items sell at regular price in other markets outside of Rockford. While plaintiff takes issue with the use of evidence of sales in non-Rockford markets, plaintiff's survey questions do not limit themselves to defen-

dant's advertisements in particular or to defendant's Rockford stores.

The court is also not particularly persuaded by the survey result that 94% of the consumers believed that more jewelry is sold at its regular price than the actual highest percentage sold by defendant in its two Rockford stores. This question, like many in plaintiff's survey, is generic in scope and does not focus on the term regular price as it is used in defendant's advertising. For example, the term regular price takes on a particular meaning in the context of plaintiff's pricing and advertising scheme. It is impossible to discern from question 19 of plaintiff's survey what context the respondents applied to the term regular price in answering the question. That alone diminishes the significance of question 19. Additionally, even if it was assumed that the respondents considered regular price in the context of a pricing and advertising scheme similar to defendant's, the percentages are not especially convincing. According to Dr. McConeghy, 94% of the respondents thought sales at the regular price occurred more than 1% of the time. While this is greater than the actual figures for some items of jewelry (0%), it is less for others (3%), at least at one of defendant's Rockford stores. The court, therefore, accords little weight to the results of question 19.

Plaintiff also relies on its assertion that only 0.8% of consumers understand that the mark-up in establishing regular price exceeded five times the cost. Again, the significance of this result is minimized by the fact that the term "regular retail price" is lacking any context. Furthermore, Dr. McConeghy admitted on cross-examination that she did not know what respondents might have interpreted the term to mean. Additionally, when asked to give a verbatim answer to what the term meant, respondents provided a wide range of answers. Nevertheless, according to Dr. McConeghy, she assumed the respondents understood what "regular retail price" meant even though she admitted there is no way to tell whether they understood that term.

As the court has explained earlier, any meaningful interpretation of the term regular price is dependent on the context in which it is used. It is difficult to attach much weight to responses that are heavily dependent on the respondents' understanding of that term when the term is used in a broad and ill-defined manner.

Plaintiff also asserts that the survey shows that customers believe that, on average, the regular retail price would be set at $228.56 for an item costing $100.00. Plaintiff contends the inference to be drawn from this result is that for those respondents a 50% discount indicates they are able to purchase the item at just above cost. The court finds such an inference to be weak, at best. The question, which pertains to mark-up, does not ask anything about discount pricing. Rather, it merely asks about mark-ups generally. It is reasonable to perceive of answers varying depending on the context in which the mark-up question is asked. While the answers to questions 15–17 may prove something about consumers' perceptions of mark-ups generally, it proves virtually nothing as to their perceptions in the context of discount pricing.

Lastly, plaintiff points to question 20 of the survey which reports that 21% of the respondents purchased an item of fine jewelry at 50% off its regular price at one store and later found the same or similar item at another store at a regular price lower than the discount price they paid earlier. Of those 21% (107 actual respondents), 67% (14% of the total) stated they felt the first store had deceived them. This is clearly the weightiest evidence plaintiff offers on the issue of whether defendant's advertisements constitute a deceptive act or practice. However, the court accords this evidence minimal weight because, at best, it only shows 14% of the total surveyed felt deceived by purchasing at 50% discount and later finding it at a regular price less than what they paid. More importantly, there is no indication that any consumer ever purchased an item of jewelry from defendant at 50% discount to later find it at regular price for less elsewhere. This again reflects an evidentiary defect in plaintiff's survey resulting from the broad-based generic inquiries used. Additionally, defendant's expert, Dr. John E. Calfee, testified that directly asking respondents whether they are deceived is an extremely

rare approach because people tend to say they are deceived even if they are not. According to Calfee, scholars typically test for evidence of deception rather than asking the direct question.

Having reviewed plaintiff's evidence on the first element of its claim under the Consumer Fraud Act, the court will now consider defendant's evidence, in particular, its survey. Dr. John E. Calfee, a Ph.D. in economics and a resident scholar at the American Enterprise Institute, researched, taught and studied marketing and deception in advertising for over 30 years. Dr. Calfee opined, based on research literature, his own research, the results of plaintiff's survey, the results of defendant's survey[6] and his field experience, that defendant's advertisements do not deceive consumers.[7]

Specifically, Calfee testified that he designed and commissioned his survey for the purpose of testing for evidence of deception from defendant's advertisements. In that regard, many of the questions refer to Bergner's stores as that is the name under which defendant's advertisements appear. To this end, respondents were asked if they were familiar with defendant's advertisements, to which 71.7% responded they were. According to Calfee, if defendant's advertisements were having a deceptive effect, respondents would be under the impression that defendant's sale prices were unusually low as compared to what they would pay elsewhere or that defendant's sale prices were unusually low as compared to the quality of defendant's jewelry. Calfee testified the results of the survey show that respondents held neither impression from defendant's advertisements. Calfee explained that consumers are primarily interested in the actual price they pay. Therefore, people buy jewelry on sale to pay a low price and because they think they received a bargain.

Calfee also testified that merely because a retailer makes no sales at regular price does not mean consumers are deceived by the discount advertisements. Specifically, he explained that the absence of sales at the regular price merely indicates that consumers are familiar with the marketing practices of the retailer and have learned to wait for a sale before making a purchase. To support his opinion in this regard, Calfee pointed to plaintiff's survey showing that 75.9% of respondents would shop at a store that was having a sale and his own survey showing that 74% of respondents purchase jewelry on sale. According to Calfee, consumers are used to seeing reference price advertising[8] and those advertisements act as a signal to consumers of the type of retailer that is advertising. Calfee also pointed out that whether any particular discount has an impact on consumers depends strongly on the identity of the retailer and the consumer's experience with the retailer.

Calfee further opined that different retailers employ different marketing strategies. Some stores do better with consistent prices while others do well with setting and then cutting prices. According to Calfee, the evidence indicates "very, very strongly" that consumers are primarily interested in the actual price they are going to pay for a product.

Lastly, Calfee opined that, assuming a retailer offers its products at a discounted price for approximately two-thirds of the time, such a technique is neither false nor misleading. This opinion is supported by the evidence in the case and the scholarly research. Furthermore, Calfee holds the opinion that defendant's advertisements, even assuming the regular price is offered only one-third of the time, do not deceive consumers. The fact that virtually no sales were made at the regular price did not alter Calfee's opinion. Calfee further explained that the fact that no sales were made at regular price shows that consumers have become familiar with the marketing practice and have learned to purchase the items when they are on sale.

Based on all of the evidence, the court finds that plaintiff has failed to meet its burden to establish the first element of its

---

**6.** Calfee referred to the survey as the awareness and imagery study.

**7.** Plaintiff offered no such counter-opinion in its case or in rebuttal.

**8.** Reference price advertising is a term used by Calfee to describe the type of advertisement used by defendant in this case.

Consumer Fraud Act claim. Thus, on that basis alone, the court finds for defendant and against plaintiff. Because the court finds plaintiff did not establish the first element of its claim, the court will not address the second element. Nor does the court have to consider the affirmative defense raised by defendant to the Consumer Fraud Act.[9] Because plaintiff has not prevailed on its underlying claim of a violation of the Consumer Fraud Act, the court further finds plaintiff is not entitled to recover any punitive damages as sought in Count III.

## II. *Lanham Act*

Section 43(a) of the Lanham Act, provides in pertinent part, that

> (a)(1) Any person who ... in connection with any goods ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> ....
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125 (1994).

■ The private remedy thus created applies with equal force to two types of false advertising. *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir.1992). First, it covers statements which are literally false. *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1088–89 (7th Cir.1994). Second, it applies to statements which are literally true or ambiguous but which convey a false impression or are misleading in context, as demonstrated by actual consumer confusion. *Id.* at 1089. The elements of such a false advertising claim are that a defendant's ad-

vertisements were: (1) false and misleading in one of the two above-described manners; (2) actually deceiving or likely to deceive a substantial segment of their audience; (3) material in their effect on purchasing decisions; (4) touting goods that entered into interstate commerce;[10] and (5) actually, or likely to be, injurious to the plaintiff. *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 857 F.Supp. 1241, 1244–45 (N.D.Ill.1994) (citations omitted).

■ The court finds plaintiff has failed to establish the first two elements of its Lanham Act claim. Without reiterating its discussion of the evidence applicable to the Consumer Fraud Act claim, the court finds that evidence fails to establish that the advertisements were literally false. The court notes, however, that plaintiff has only pointed to the evidence of the minimal number of sales made by defendant at regular price combined with plaintiff's survey showing that 94% of the respondents expected sales greater than the actual number as proof of literal falsity. This evidence falls far short of establishing literal falsity, especially when viewed in light of defendant's evidence to the contrary.

Plaintiff points to its survey evidence and the evidence cited as support for the first element of its Consumer Fraud Act claim to establish that defendant's advertisements are misleading. For the reasons explained earlier, the court finds this evidence, when weighed against that of defendant, to be insufficient to prove that defendant's advertisements are misleading or convey a false impression. Therefore, the court finds that plaintiff has not established its Lanham Act claim on that basis alone.

Alternatively, the court also finds that plaintiff has failed to establish the second element, that defendant's advertisements are actually deceiving or likely to deceive a substantial segment of their audience. As noted in the discussion concerning the Consumer Fraud Act, plaintiff's evidence does not prove

---

**9.** As such, the court does not consider whether defendant complied with federal and state regulations pertaining to the amount of time, the way and the purpose for which an item is offered for sale at its regular price. The court notes, however, that from its reading of the federal and state regulation there is no magic number of days for

which an item is offered for sale that equates with compliance within the meaning of the regulations.

**10.** The parties have stipulated that this element has been established.

actual deception. Nor does it show the likelihood of deception. Plaintiff has failed to overcome the persuasive testimony of Dr. Calfee and the results of defendant's survey, both of which go more directly to the issue of the deceptiveness of defendant's advertisements than any of plaintiff's evidence. Because the court has found for defendant on the first two elements of plaintiff's claim, it will not address the remaining two contested elements or any of the damages issues.

For the foregoing reasons, the court grants judgment in favor of defendant and against plaintiff on all three of plaintiff's claims in its second amended complaint.